1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SHAUN SHANNON,

               Plaintiff,

   v.

WINDSOR EQUITY GROUP, INC.,

               Defendant.

Case No. 12-cv-1124-W(JMA)

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. 21], AND**

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 22]**

     This action arises from Plaintiff Shaun Shannon's allegations that Defendant Windsor Equity Group, Inc. ("Windsor Group") violated federal and state debt-collection laws when it attempted to repossess an automobile. Now pending before the Court are Mr. Shannon's motion for summary judgment and Windsor Group's cross-motion for partial summary judgement. Both motions are opposed.

//

The Court decides the matter on the papers submitted and without oral argument.  See Civ. L.R. 7.1(d.1).  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment, and **GRANTS IN PART** and **DENIES IN PART** Defendant's cross-motion for partial summary judgment.

## I.    BACKGROUND

### A.    Windsor Equity Group, Inc.

Windsor Group is a "loan servicing company" based in Dallas, Texas, that uses various methods to "maximize recoveries" on their clients' "delinquent consumer vehicle loans." (McCrary Dep. 34:10–25; McCrary Dep. Exs. B1, B3.)  "Windsor Group locates people and collateral—primarily vehicles—for its clients who have a security interest in the collateral." (McCrary Decl. (Oct.) ¶ 4.)

One of the services that Windsor Group provides is "skip tracing." (McCrary Dep. 31:12–19, 76:2–3; McCrary Decl. (Sept.)[1] ¶ 3.) Windsor Group's employee training manual defines "skip tracing" as "following the trail, searching for, and uncovering the location of an individual or item that has disappeared." (McCrary Dep. Ex. H.)  After locating an individual or item, a skip tracer either arranges for repossession or transfers the case to the client to potentially work out a payment plan separately. (McCrary Dep. 31:12–19, 85:16–21.)  Windsor Group also requires all of its skip-tracer case workers to "follow[] state and federal regulations regarding collection procedures," including the Fair Debt Collection Practices Act ("FDCPA"). (McCrary Dep. 33: 3–12; McCrary Dep. Ex. B2; McCrary Decl. (Oct.) ¶ 8.)  FDCPA compliance is even advertised to prospective clients, though Windsor Group explains

---

[1] Windsor Group attaches two declarations of Cliff McCrary, Windsor Group's CEO.  The first is in support of Windsor Group's opposition to Mr. Shannon's summary-judgment motion dated September 20, 2013 (Doc. 23-1), and the second is in support of Windsor Group's cross-motion for partial summary judgment dated October 14, 2013 (Doc. 22-2).  The Court will distinguish one declaration from the other based on their respective dates.

1   that the FDCPA is only used as a "best practices benchmark." (McCrary Dep. Ex. B2;
2   McCrary Decl. (Oct.) ¶ 8.)

3       In addition to skip tracing, Windsor Group advertised that it offers services for
4   "National Repossession Management" to "efficiently manage all [their] clients'
5   collateral recovery needs" and "Remarketing Management" to "help[] clients quickly
6   and efficiently remarket repossessed vehicles." (McCrary Dep. Ex. B2.)   The
7   remarketing management included services such as auction communication,
8   transportation, reconditioning and repair, floor pricing, live in-person representation,
9   online sales, and transfer of auction proceeds. (Id.)   However, according to the
10  deposition testimony of Windsor Group's CEO, Cliff McCrary, Windsor Group sold its
11  remarketing subsidiary in July 2012, but continues to offer its repossession services to
12  clients. (McCrary Dep. 25:1–11, 134:8–18.)

13      On or about October 20, 2011, Ally Financial, LLC referred a case to Windsor
14  Group. (McCrary Decl. ¶ 10.)   The assignment was to locate a 2006 Cadillac Escalade
15  owned by Ina Bragg and arrange the vehicle's repossession. (Id.)   Ms. Bragg had
16  purchased the vehicle for personal use, but then had fallen behind on her payments.
17  (McCrary Dep. 64:1–65:18)   At the time, Windsor Group was contractually obligated
18  to Ally Financial to "provide Repossession Management services including skip tracing
19  to locate the vehicles and overseeing repossession of the vehicles." (Id. ¶ 11.)   Windsor
20  Group emphasizes that the agreement with Ally Financial explicitly states that Windsor
21  Group "will not engage in collection activity under any circumstances." (Id.)   And
22  regarding the 2006 Cadillac Escalade, Windsor Group contends that it did not attempt
23  to collect any debt from Ms. Bragg, but rather merely tried to locate the vehicle. (Id.
24  ¶ 12.)   It attempted to locate the vehicle based on information received through a
25  telephone call from Ms. Bragg's relative, who informed Windsor Group that Mr.
26  Shannon possessed the vehicle. (Id.)   According to Windsor Group, one of its
27  employees then "attempted to call Mr. Shannon and his place of employment to
28

12cv1124

confirm that Mr. Shannon had the vehicle and arrange to have the vehicle picked-up at the place of employment." (Id.)

**B.    Patrick Cannon's Phone Calls to Mr. Shannon at Jet Source, Inc.**

Patrick Cannon was Windsor Group's case worker assigned to arrange for the repossession of the 2006 Cadillac Escalade. (Shannon Decl. ¶¶ 3–17.) At the time, Mr. Shannon was employed by Jet Source, Inc., located at Palomar Airport in Carlsbad, California. (Id. ¶ 2.) Based on the information received from Ms. Bragg's relative, Mr. Cannon began repeatedly contacting Mr. Shannon and his co-workers at Jet Source. (Id. ¶¶ 3–17.)

The first communication occurred on January 5, 2012, when Mr. Cannon left a message for Mr. Shannon at Jet Source. (Shannon Decl. ¶ 3.) When Mr. Shannon returned his phone call, he asked Mr. Cannon for the reason for the call. (Id. ¶ 3–5.) According to Mr. Shannon, Mr. Cannon told him that he had called earlier on behalf of "Ina" and that Mr. Shannon "needed to return the car." (Id. ¶ 6.) When Mr. Shannon said that he did not know what Mr. Cannon was talking about, Mr. Cannon raised his voice and said, "You know damn well what I am talking about." (Id. ¶¶ 7–8.) Mr. Shannon reiterated that he did not know the reason for the call and told Mr. Cannon that he was not allowed to take personal calls at work. (Id. ¶ 9.) Mr. Cannon then responded by yelling, and using profanities and threats that he would "make sure" that Mr. Shannon would get fired, arrested, and sued. (Id. ¶¶ 10–11.) Eventually, Mr. Shannon told Mr. Cannon not to call any more and hung up. (Id. ¶ 12.)

A few minutes later, Mr. Cannon called Mr. Shannon's co-worker at Jet Source. (Shannon Decl. ¶ 13.) According to the co-worker, Mr. Cannon became "abusive" and "began yelling" at her. (Anderson Decl. ¶ 5.) After Mr. Shannon overheard who was on the phone, he took the telephone, told Mr. Cannon to stop calling, and hung up. (Shannon Decl. ¶ 15.) Almost immediately thereafter, Mr. Cannon called the same co-worker back, demanding that she transfer him to Mr. Shannon's supervisor. (Anderson

1  Decl. ¶ 7.)  Because she "did not want to deal with more abuse," the co-coworker
2  transferred the call.  (Id. ¶ 8.)

3       According to the supervisor, Mr. Cannon told the supervisor that he needed to
4  speak to Mr. Shannon, but the supervisor responded that he would give Mr. Shannon
5  Mr. Cannon's message. (Bowers Decl. ¶ 5.)  The supervisor refused to give Mr. Cannon
6  any information regarding Mr. Shannon's location, work schedule, vehicle, and parking
7  location because Jet Source has a policy against giving out such information.  (Id. ¶¶
8  6–7.)  Later that same day, Mr. Cannon called the supervisor again, and "became
9  abusive, demanding that [he] give him information regarding Shaun Shannon." (Id. ¶
10 8.) But when the supervisor explained that Mr. Cannon needs to speak with someone
11 from the Human Resources Department, Mr. Cannon "continued with his abusive
12 behavior," so the supervisor ended the call.  (Id. ¶ 9.)

13      Mr. Cannon continued to call throughout the following days.  (Shannon Decl.
14 ¶ 16; Bowers Decl. ¶ 10; Anderson Decl. ¶¶ 11–13.)  During that time period, Mr.
15 Cannon continued engaging in his aggressive conduct, including an instance when Mr.
16 Cannon "yelled" at the aforementioned co-worker that she "needed to get it through
17 [her] head" that he "needed access" to Palomar Airport.  (Anderson Decl. ¶ 12.)
18 During another phone call, Mr. Cannon even informed Jet Source's human resources
19 representative that Mr. Shannon had "stole[n] a vehicle from a little old lady, and that
20 [he] was in possession of a stolen vehicle." (Shannon Decl. ¶ 17.)  Mr. Shannon
21 declares under penalty of perjury that the accusations are false, and that he never has
22 been in possession of any stolen vehicle.  (Id. ¶¶ 18–24.)  The only times when he used
23 the 2006 Cadillac Escalade were when it was lent to him for three days in November
24 2011 when his vehicle was being repaired, and one evening in April 2012 when he was
25 asked to drive a friend home who had been drinking.  (Id. ¶¶ 25–31.)  The 2006
26 Cadillac Escalade was returned after both instances.  (Id. ¶¶ 27, 31.)

27      According to Mr. Shannon, between January 5 and January 9, 2012, Mr. Cannon
28 called him between ten and twenty times at work.  (Shannon Dep. 53: 21–25.)

On May 8, 2012, Mr. Shannon commenced this action seeking relief under the FDCPA, 15 U.S.C. § 1692, *et seq.*, and the California Rosenthal Fair Debt Collection Act ("Rosenthal Act"), California Civil Code §1788, *et seq.*  On November 8, 2012, Mr. Shannon amended his complaint to include a claim for defamation.  The parties then filed cross-motion for summary judgment.  Both motions are opposed.

## II.    LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine

12cv1124

1   issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing

2   Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir. 1995)).  If the

3   moving party fails to discharge this initial burden, summary judgment must be denied

4   and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress

5   & Co., 398 U.S. 144, 159-60 (1970).

6        If the moving party meets this initial burden, the nonmoving party cannot defeat

7   summary judgment merely by demonstrating "that there is some metaphysical doubt as

8   to the material facts." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475

9   U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th

10  Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving

11  party's position is not sufficient.") (citing Anderson, 477 U.S. at 242, 252).  Rather, the

12  nonmoving party must "go beyond the pleadings" and by "the depositions, answers to

13  interrogatories, and admissions on file," designate "specific facts showing that there is

14  a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

15       When making this determination, the court must view all inferences drawn from

16  the underlying facts in the light most favorable to the nonmoving party.  See

17  Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and

18  the drawing of legitimate inferences from the facts are jury functions, not those of a

19  judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477

20  U.S. at 255.

21       The mere fact that the parties filed cross-motions "does not necessarily mean

22  there are no disputed issues of material fact and does not necessarily permit the judge

23  to render judgment in favor of one side or the other." Starsky v. Williams, 512 F.2d

24  109, 112 (9th Cir. 1975). "[E]ach motion must be considered on its own merits." Fair

25  Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir.

26  2001). Furthermore, the court must consider evidence submitted in support of and in

27  opposition to both motions before ruling on either one.  Id.

28  //

-7-

III.   **DISCUSSION**

The FDCPA aims to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). Before enacting the FDCPA, Congress found that abusive debt collection practices contributed to "personal bankruptcy, marital instability, the loss of employment, and invasions of individual privacy." Id. § 1692(a).  The FDCPA sets limits for how debt collectors may interact with consumer debtors and third parties while engaging in activities connected to the collection of any debt.  Id. § 1692, et seq.  The Rosenthal Act aims to achieve similar goals based on a similar findings. Cal. Civ. Code § 1788.1.

The parties filed cross-motions for summary judgment addressing several issues. Both parties move for summary judgment regarding whether Windsor Group is a "debt collector" under the FDCPA and Rosenthal Act—Mr. Shannon argues that Windsor Group is a debt collector, and Windsor Group argues that it is not.  Additionally, Windsor Group argues that Mr. Shannon lacks standing to assert a claim under the FDCPA and the Rosenthal Act, and Mr. Shannon also argues that Windsor Group is liable under the FDCPA and Rosenthal Act.  The Court addresses each issue below.

**A.    Windsor Group Is a "Debt Collector" Subject to the FDCPA.**

Only persons or entities established as "debt collectors," as provided in § 1692a(6), are subject to the FDCPA's restrictions. Heintz v. Jenkins, 514 U.S. 291, 292 (1995); Romine v. Diversified Collection Servs., Inc., 155 F.3d 1142, 1146 (9th Cir. 1998). Determining whether a party is a "debt collector" under the FDCPA "depend[s] upon the nature of the activities in the individual case," not whether a party calls itself a debt collector or a collection agency. Romine, 155 F.3d at 1149 (citing Jenkins v. Heintz, 25 F.3d 536, 539 (7th Cir. 1994)).  To define a party as a debt collector, the courts should look to the plain language of the statute.  Id. at 1145.  The FDCPA

-8-

defines a "debt collector" as follows:

> Any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another . . . . For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests[.]

15 U.S.C. § 1692a(6).  It also lists six categories of actors that are specifically excluded from the classification as a debt collector.  15 U.S.C. § 1692a(6)(A)-(F).  Skip tracers, repossession-remarketing services, and repossession agencies are not among the six categories explicitly listed as excluded from debt-collector status.  See id.

Windsor Group argues it is not a debt collector for purposes of general FDCPA application because it is not "in the business of debt collection and does not regularly collect any debts." (Def.'s Mot. 4:14–20; Def.'s Opp'n 6:14–20.)  Rather, it asserts that it "plays the role" of a skip-tracing company and a repossession-management agency only, never demanding, accepting, or collecting any payment of debts.  (Id.)  The parties appear to agree that Windsor Group's activities do not constitute direct debt collection.  Instead, the dispute lies in the question of whether Windsor Group regularly engaged in attempts to indirectly collect debts, and if so, whether Mr. Cannon's contact with Mr. Shannon was a violation of the FDCPA.  As the parties point out in their briefs, guidance regarding this issue is sparse.[2]  However, the Ninth Circuit has laid out important principles for determining whether an entity has engaged in indirect debt collection.  See Romine, 155 F.3d at 1146; see also Freeman v. ABC Legal Servs., Inc., 827 F. Supp. 2d 1065, 1072 (N.D. Cal. 2011).

Indirect debt collection ranges from litigating and filing warrants on behalf of creditors to simply retrieving phone numbers for creditors and debt-collection agencies.  See Heintz v. Jenkins, 514 U.S. at 299; Romine, 155 F.3d at 1147; Scott v. Jones, 964

---

[2] The parties cite to many cases that are not binding on this Court regarding this issue.  The Court will not address these cases unless doing so is particularly helpful.

F.2d 314, 316 (4th Cir. 1992). "Moreover, the fact that the FDCPA specifically exempts process servers from being debt collectors indicates that without this special exemption, . . . the service of legal process in debt collection actions is generally considered an indirect form of debt collection under the FDCPA." <u>Freeman</u>, 827 F. Supp. 2d at 1073. <u>Romine</u> strongly suggests that skip tracing when used to aid or facilitate the collections process brings that service under the scope of the FDCPA. <u>See</u> <u>Romine</u>, 155 F.3d at 1149. This measured approach is sensible because it protects potential plaintiffs from debt collectors that use third parties as extensions for their wrongful conduct or disingenuous organizational labels in order to circumvent the FDCPA.

In <u>Romine</u>, the Ninth Circuit recognized that "one need not gain possession of a debt, or personally benefit financially from the satisfaction of a debt, in order to assume liability as a 'debt collector' under the FDCPA." 155 F.3d at 1146. In that case, defendant Western Union entered into a service agreement with a debt-collection company to obtain the personal information of debtors. <u>Id.</u> at 1143-44. To achieve that goal, Western Union sent debtors notices that they had received personal telegrams, but when debtors called to retrieve their messages, Western Union required the debtors to first provide their telephone numbers. <u>Id.</u> at 1144. That process was known as an "automated voice telegram" ("AVT") service. <u>Id.</u> After securing the personal information, Western Union would read aloud the debt-collection message that had been provided by the creditor and would then forward the previously unlisted numbers to the debt-collection company. <u>Id.</u> Even though Western Union was a third party that was not directly benefitting from the debt-collection practice, the court nonetheless held that its role in the process could qualify as indirect debt collection under the FDCPA. <u>Id.</u> at 1149.

The circumstances in this case are quite similar to those in <u>Romine</u>. To begin, Windsor Group entered into a service agreement with Ally Financial to produce a debtor's personal information—in this case, that personal information was the location

12cv1124

1   of a particular vehicle, Ms. Bragg's 2006 Cadillac Escalade.  Much like Western Union

2   in <u>Romine</u>, Windsor Group was a third party hired in order to obtain personal

3   information needed for the creditor apparently for the purpose of collecting a debt.

4   After locating an individual or item, a Windsor Group skip tracer would either arrange

5   for repossession or transfer the case to the creditor to work out payments separately.

6   Mr. Cannon successfully found Mr. Shannon in the process of locating the vehicle, and

7   then proceeded to contact him at his work place numerous times.  Though the means

8   are a bit different, both Windsor Group and Western Union had the same purpose—to

9   aid or facilitate the collection process—and advertised their services for that very

10  purpose.

11       The Ninth Circuit found it particularly important that Western Union advertised

12  its AVT service specifically for the collection industry to "catalyze debt collection

13  activity."  <u>Romine</u>, 155 F.3d at 1147.  Here, Windsor Group offered all of its services

14  to debt collectors and creditors for the explicit purpose of "maximizing recoveries for

15  delinquent auto loans."  (<u>See</u> McCrary Decl. ¶ 7; McCrary Dep. Exs. B1, B2, B3.)  It

16  advertised all of its services to recover debts owed to creditors, calling itself a "loan

17  servicing company."  (<u>See id.</u>)  Windsor Group even advertised the fact that they follow

18  FDCPA requirements.  (<u>See</u> McCrary Dep. 33:3–12; McCrary Dep. Ex. B2; McCrary

19  Decl. ¶ 8.)  It regularly offered its skip tracing, remarketing, and repossession services

20  in order to help resolve consumer debts.  Furthermore, Windsor Group's remarketing

21  service included transportation of repossessed automobiles, repairs, reconditioning,

22  pricing, auction, sales, and transfer of auction proceeds to their clients.  (<u>See</u> McCrary

23  Dep. Exs. B2, D.)  Compared to Western Union's mere procurement of debtors' phone

24  numbers through their AVT service, Windsor Group's remarketing activity is much

25  more involved in the process of collecting automobile debts.  Consequently, any

26  communications with consumer debtors or third parties in this process falls within the

27  scope of the FDCPA.  See <u>Romine</u>, 155 F.3d at 1147.

28  //

12cv1124

The legislative history of the FDCPA states that "the requirement that debt collection be done 'regularly' would exclude a person who collects for another in an isolated instance, but would include those who collect for others in the regular course of business."  S. Rep. No. 95-382, 95th Cong. 1st Sess. 2 (1977), *reprinted in* U.S.C.C.A.N. 1695, 1697-98.  In Romine, Western Union's telegram service to gather personal information from debtors was advertised as being specially developed for the credit and collections industry, and the service was well publicized as such.  155 F.3d at 1146.  That was enough for the Ninth Circuit to conclude that Western Union's service was in the regular course of business and not an isolated occurrence.  Id.

As discussed above, Windsor Group advertised skip tracing, remarketing, and repossession services, and it does not deny performing these services for its clients on an ongoing basis.  (See McCrary Dep. 25:1–11; McCrary Dep. Ex. B2.)  There is no reason to believe that any of these widely marketed services were performed only in isolated instances.  Consequently, following Romine, the Court also concludes that Windsor Group's activities were sufficiently regular to fall within the scope of the FDCPA.  See Romine, 155 F.3d at 1146.

In light of the foregoing, Windsor Group's skip-tracing and other collection-related services in addition to its advertisements of these services leads this Court to conclude that Windsor Group is a debt collector under the FDCPA.  See 15 U.S.C. § 1692a(6); Romine, 155 F.3d at 1149.  Accordingly, the Court **GRANTS** Mr. Shannon's summary-judgment motion and **DENIES** Windsor Group's cross-motion as to Windsor Group's status as a debt collector under the FDCPA.

**B.    Windsor Group Is a "Debt Collector" Subject to the Rosenthal Act.**

The purpose of the Rosenthal Act is "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts."  Cal. Civ. Code § 1788.1(b).  Some of the prohibited practices contemplated by the legislature include

-12-

1   "[u]sing obscene or profane language[,]" and "[c]ommunicating, by telephone or in

2   person, with the debtor with such frequency as to be unreasonable and to constitute an

3   harassment to the debtor under the circumstances."[3] Id. § 1788.11(a), (e).

4           Like the FDCPA, the Rosenthal Act applies only to debt collectors.  Izenberg v.

5   ETS Servs., LLC, 589 F. Supp. 2d 1193, 1199 (C.D. Cal. 2008).   However, the

6   definition of "debt collector" found in the Rosenthal Act is broader than the FDCPA's.

7   Id.  The Rosenthal Act defines a "debt collector" as "any person who, in the ordinary

8   course of business, regularly, on behalf of himself or herself or others, engages in debt

9   collection." Cal. Civ. Code. § 1788.2(c).  It also defines "debt" as "money, property or

10  their equivalent which is due or owing or alleged to be due or owing from a natural

11  person to another person," and "debt collection" as "any act or practice in connection

12  with the collection of consumer debts." Id. § 1788.2(b), (d).

13          Windsor Group argues that it is not a debt collector under the Rosenthal Act for

14  two reasons: (1) based on the FDCPA and Rosenthal Act having "minor differences,"

15  it is not a debt collector under the Rosenthal Act because it is not one under the

16  FDCPA; and (2) foreclosing on mortgages and repossessions of automobiles are not

17  debt collection activities "envisioned" by the Rosenthal Act. (Def.'s Mot. 10:8–13:15.)

18  In contrast, Mr. Shannon focuses on the Rosenthal Act's use of the word "property,"

19  arguing that the nature of the debt sought by Windsor Group is unequivocally within

20  the scope of the Rosenthal Act because automobiles are property.   (Pl.'s Mot.

21  20:5–22:2.)  Neither parties' arguments are particularly compelling.

22          The relevance of Windsor Group's emphasis on foreclosing mortgages is unclear.

23  It fails to present any evidence that this case involves a foreclosure of a mortgage.  And

24  if it did include evidence of a foreclosure, then its briefs certainly do not cite to that

25  evidence.   In fact, "foreclosure" is not mentioned anywhere in Windsor Group's

26  summary-judgment motion or its opposition to Mr. Shannon's motion except to present

27

28          [3] Mr. Shannon argues that the debt at issue in this action is a consumer debt.  (Pl.'s Mot.
    22:4–21.)  Windsor Group does not dispute that assertion, apparently conceding to its merits.  Thus,
    the Court **GRANTS** Mr. Shannon's summary-judgment motion as to that issue.

12cv1124

this argument.  All mentions of foreclosures are limited to pages 11 and 12 of Windsor Group's motion, and pages 15 and 16 of its opposition.  (See Def.'s Mot. 11:10–12:14 ("foreclosure" is mentioned 8 times); Def.'s Opp'n 15:11–16:27 ("foreclosure" is mentioned 11 times).)  Thus, Windsor Group fails to provide any evidence that remotely suggests that a foreclosure of a mortgage occurred in or is relevant to this action.

Even if the Court interprets its argument as asserting that foreclosures and repossessions are either the same or similar thereby providing an argument by analogy, Windsor Group's argument remains unpersuasive.  The only proposition that Windsor Group offers that could arguably support this interpretation is the following statement: "While Plueger dealt specifically with automobile repossession, the court's conclusion that enforcement of a security interest does not fall within the scope of debt collection under the Rosenthal Act has been confirmed in other contexts as well, most notably with respect to the foreclosure of second mortgages." (Def.'s Mot. 11:11–16.)  Looking more closely at Windsor Group's attempt to connect mortgage foreclosures and repossessions, Windsor Group fails to adequately explain that connection beyond the aforementioned statement, or support it with any relevant legal authority.  Merely stating that something is true does not make it so.  Thus, the Court rejects that argument.

Windsor Group also fails to adequately support its argument that repossessions are squarely outside the scope of the FDCPA and the Rosenthal Act with any binding legal authority.  For that proposition, Windsor Group relies almost exclusively on Pflueger v. Auto Finance Group, Inc., No. CV-97-9499, 1999 WL 33740813 (C.D. Cal. Apr. 26, 1999).  Pflueger initially opines that repossession agencies "fall outside the ambit of the FDCPA except for the provisions of § 1692f(6)," but it did so without applying the principles laid out in Romine.  See Pflueger, 1999 WL 33740813, at *3-4.  Specifically, Pflueger did not determine whether repossession agencies are services "that aid or facilitate the collection process," a consideration that Romine emphasizes.  See

1   Romine, 155 F.3d at 1149; Pflueger, 1999 WL 33740813, at *3-4.  Rather, while

2   exclusively relying on cases outside of the Ninth Circuit, Pflueger summarily concluded

3   that repossession agencies are not debt collectors.  Pflueger, 1999 WL 33740813, at *3-

4   4 (citing Seibel v. Soc. Lease, Inc., 969 F. Supp. 713 (M.D. Fla. 1997); Clark v. Auto

5   Recovery Bureau Conn., Inc., 889 F. Supp. 543 (D. Conn. 1994); Jordan v. Kent

6   Recovery Servs., Inc., 731 F. Supp. 652 (D. Del. 1990)) ("[T]he Court must determine

7   whether [the alleged debt collector] is only a repossession agency, or if it falls within the

8   definition of 'debt collector' as defined by the Act.").  Pflueger's analysis is not entirely

9   consistent with Romine's, which refused to draw a bright line defining particular

10  services as "debt collectors," and rather instructed that "an organizational label is

11  insufficient to insulate a party from liability under [the FDCPA]" and that

12  "determination would depend upon the nature of the activities in the individual case."

13  Romine, 155 F.3d at 1149; see Pflueger, 1999 WL 33740813, at *3-4.  Additionally,

14  Pflueger is not binding authority on this Court while Romine is.  For these reasons, the

15  Court declines to follow Pflueger, and rejects Windsor Group's contention that the

16  FDCPA and Rosenthal Act do not apply to it because it labels itself as a repossession

17  agency.

18          Moving on, the Court agrees with Mr. Shannon that the Rosenthal Act defines

19  debt to include property.  See Cal. Civ. Code. § 1788.2(d).  One does not need to go

20  beyond the plain language of the statute to make that determination.  See id.  Windsor

21  Group attempts to refute Mr. Shannon's contention by factually distinguishing cases

22  that Mr. Shannon cites, and then tries to replace his definition by referring to its

23  "overwhelming authority."  (See Def.'s Opp'n 16:10–21.)  But that "overwhelming

24  authority" addresses foreclosures and mortgages, which are not relevant to this case.

25  (See id. at 15:18–16:9.)  Windsor Group tries to make its "overwhelming authority"

26  relevant by appending the statement, "This is true even though a house is indisputably

27  'property'", but without any further explanation, that is a futile attempt at best.  (See

28  id. at 16:9.)  Ultimately though, determining whether a debt includes property such as

-15-

an automobile is not particularly important; the primary issue that the Court needs to consider to determine whether Windsor Group is a debt collector is whether it "regularly . . . engages in debt collection" and whether its practices are "connect[ed] with the collection of consumer debts." Cal. Civ. Code § 1788.2(c)-(d). There is evidence before the Court that the repossession attempt is connected to a consumer debt incurred by Ms. Bragg, and that it generally provides its services in connection with "delinquent consumer loans." Consequently, Windsor Group's skip-tracing, remarketing, and repossession services, or some combination of the three can all serve as a basis to find that it is a debt collector.

In light of the foregoing, and incorporating the Court's earlier analysis finding that Windsor Group is a debt collector under the FDCPA, the Court also concludes that Windsor Group is a debt collector under the Rosenthal Act. See Cal. Civ. Code § 1788.2. Therefore, the Court **GRANTS** Mr. Shannon's summary-judgment motion and **DENIES** Windsor Group's cross-motion as to Windsor Group's status as a debt collector under the Rosenthal Act.

### C.    Mr. Shannon Has Standing under the FDCPA and the Rosenthal Act.

The FDCPA prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse *any person* in connection with the collection of a debt." 15 U.S.C. § 1692d (emphasis added). It also prohibits any debt collector from "communicating with *any person* other than the consumer for the purpose of acquiring location information about the consumer . . . more than once unless requested to do so by such person or unless the debt collector believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information." Id. § 1692b(3) (emphasis added).

The Rosenthal Act has similar provisions that apply generally to individuals. For example, the Rosenthal Act prohibits "[t]he use, or threat of use, of physical force or violence or any criminal means to cause harm to the person, or the reputation, or the

property of *any person*." Cal. Civ. Code § 1788.10(a) (emphasis added). It also prohibits "[t]he threat to *any person* that nonpayment of the consumer debt may result in the arrest of the debtor or the seizure, garnishment, attachment or sale of any property or the garnishment or attachment of wages of the debtor, unless such action is in fact contemplated by the debt collector and permitted by the law." Id. § 1788.10(e) (emphasis added). Though § 1788.30 appears to limit liability of debt collectors to debtors, § 1788.17 provides that "[n]otwithstanding any other provision of this title, every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j . . . and shall be subject to the remedies in [15 U.S.C.] Section 1692k[.]"

After reviewing the language of the FDCPA and the evidence that the parties present, the Court concludes that Mr. Shannon has standing to assert his claims under the FDCPA at least for alleged violations of § 1692d and §1692b(3), both of which apply to non-debtors. That conclusion is supported by the plain language of the FDCPA. However, Windsor Group is correct insofar as the remaining provisions under which Mr. Shannon asserts an FDCPA violation, which require the plaintiff to be a consumer debtor. See 15 U.S.C. §§ 1692b(2), 1692c, 1692e, 1692f, 1692g. Mr. Shannon fails to present a valid justification that he is a consumer debtor who should be permitted to continue pursuing his claim under these remaining provisions of the FDCPA. Thus, insofar as the remaining provisions, and because of Mr. Shannon's apparent concession regarding the issue, the Court finds that Mr. Shannon lacks standing to assert a claim under the remaining provisions of the FDCPA. See 15 U.S.C. §§ 1692b(2), 1692c, 1692e, 1692f, 1692g.

For similar reasons as above, and because the Rosenthal Act requires debt collectors to comply with Sections 1692b to 1692j under the FDCPA, Mr. Shannon also has standing to assert a claim under the Rosenthal Act. Applying the transitive property, if an individual has standing to assert a claim under Sections 1692b to 1692j under the FDCPA, that individual must also having standing to assert a claim under the

12cv1124

1   Rosenthal Act. <u>See</u> Cal. Civ. Code § 1788.17. Here, the Court found that Mr.
2   Shannon has standing to at least assert claims under § 1692d and § 1692b(3) of the
3   FDCPA, therefore he also has standing to assert these claims under the Rosenthal Act.

4        Insofar as standing under the remaining provisions of the Rosenthal Act, the
5   statute applies to debtors, which the statute defines as "a natural person from whom a
6   debt collector seeks to collect a consumer debt which is due and owing or *alleged to be*
7   *due and owing from such person*." Cal. Civ. Code §§ 1788.2, 1788.30 (emphasis added).
8   Windsor Group is correct that it is undisputed that Mr. Shannon was not a debtor.

9        The remaining question is whether Windsor Group sought to collect a consumer
10  debt which was alleged to be due and owing from Mr. Shannon. <u>See</u> Cal. Civ. Code §§
11  1788.2, 1788.30. Windsor Group directs the Court's attention to Mr. Shannon's
12  deposition testimony to support its position that it did not seek to collect a consumer
13  debt alleged to be due and owing from Mr. Shannon. (Def.'s Opp'n 18:28–19:2.) In
14  that deposition, in response to the question if he believed that Windsor Group "was
15  trying to collect any debt from [him]," Mr. Shannon stated that he "can't call it a debt
16  because [he does not] owe them anything." (Shannon Dep. 79:3–9.) The deposition
17  continues with Mr. Shannon stating that Windsor Group did not ask him to "pay
18  anything," but did question him in order to "try to find the Cadillac Escalade." (<u>Id.</u>
19  79:11–22.) Windsor Group fails to provide any legal authority that supports the
20  proposition that merely not asking for a debt adequately insulates it from the Rosenthal
21  Act. Given the evidence of Mr. Cannon's aggressive conduct on Windsor Group's
22  behalf, there is question of fact that remains regarding what that conduct suggests about
23  Windsor Group's intentions in contacting Mr. Shannon. At this point, the Court is
24  reluctant to insulate Windsor Group from the Rosenthal Act merely because it did not
25  explicitly request payment. Rather, the Court defers the issue of Mr. Shannon's
26  standing as to the remaining provisions under the Rosenthal Act until these questions
27  of fact are resolved.
28  //

12cv1124

1    Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Windsor

2    Group's cross-motion for partial summary judgment as to Mr. Shannon's standing under

3    the FDCPA.  The Court also **DENIES** Windsor Group's cross-motion as to Mr.

4    Shannon's standing under the Rosenthal Act.


6    **D.    There Are Genuine Issues of Material Facts Regarding Windsor**

7          **Group's Conduct.**

8    Mr. Shannon argues that the Court should find Windsor Group liable under the

9    FDCPA and the Rosenthal Act. (Pl.'s Mot. 23:8–24:20.)  With respect to the FDCPA,

10   Mr. Shannon explains that "[o]nce we establish that Windsor Group is a debt collector,

11   there is little real dispute left on liability."  (Id.)  His justification for liability under the

12   Rosenthal Act is equally cryptic: "Windsor Group is certainly a debt collector under the

13   Rosenthal Act's broader definition, which includes collection of property, and the acts

14   described above clearly violate the portions of the FDCPA incorporated into the

15   Rosenthal Act."  (Id.)  Mr. Shannon's reply brief fails to elaborate on either of these

16   aforementioned explanations.

17   Windsor Group responds by identifying several triable issues of fact.  (Def.'s

18   Opp'n 19:8–20:20.)  It contends that it was only engaged in repossession services when

19   Mr. Cannon contacted Mr. Shannon, and liability of under § 1692d presents issues that

20   should be determined by a jury, such as, among others, whether the natural

21   consequence of Mr. Cannon's conduct was to "harass, abuse or oppress," and whether

22   Mr. Cannon repeatedly caused the telephone to ring "with the intent to annoy, abuse,

23   or harass."  See 15 U.S.C. § 1692d.  Windsor Group also maintains that its "bona fide

24   error defense" should be determined by a jury.  (Def.'s Opp'n 19:8–20:20.)

25   The Court agrees with Windsor Group that many of the issues that it presents

26   probably should be resolved by a jury.  However, ultimately, Mr. Shannon fails to meet

27   his burden under Rule 56(c) to demonstrate that there is an absence of genuine issues

28   of material fact.  See Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322.  His terse attempts

-19-

12cv1124

to argue otherwise are wholly inadequate.  Therefore, based on Mr. Shannon's failure to demonstrate an absence of genuine issues of material fact, the Court **DENIES** Mr. Shannon's summary-judgment motion as to Windsor Group's liability under the FDCPA and the Rosenthal Act.

## IV.    CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment (Doc. 21), and **GRANTS IN PART** and **DENIES IN PART** Defendant's cross-motion for partial summary judgment (Doc. 22).

**IT IS SO ORDERED.**

DATE: March 12, 2014

_____
HON. THOMAS J. WHELAN
United States District Court
Southern District of California